# In The Matter Of:

*Anthony Roberson vs*
*Correctional Officer Cole Anderson*

*Kisha DeNeal*
*October 31, 2019*

*ADVANTAGE REPORTING SERVICE*
*110 S.W. JEFFERSON AVE., SUITE 430*
*PEORIA, IL   61602*
*PHONE: 309-673-1881   FAX: 309-673-0341*
*reportingservice@att.net*

Original File 10-31-19, DeNeal, JILL.txt
Min-U-Script® with Word Index

Exhibit A

Page 5

him. Let's put it like that.
Q. Okay. And do you recall when you first met Mr. Roberson?
A. Yes, I do.
Q. Can you tell me about that?
A. Oh, my God. It was some years ago. It had to have been when I first came to Danville. So what's this, 2019? So I'm going to say probably early 2000. It's been a minute.
Q. Okay. And when did you and Mr. Roberson become involved?
A. Oh, my God. Like right -- soon after I met him, so to speak.
Q. All right. And how long were you involved with Mr. Roberson?
A. Just about the same amount I've been in Danville, about six years. Off and on.
Q. Okay. And do you currently see Mr. Roberson?
A. No.
Q. Okay. Do you remember the last time it was that you saw him?
A. No.

Page 6

Q. Okay. Have you ever known Mr. Roberson to be employed?
A. No.
Q. Okay.
   MR. CONDON: If you could mark this as Exhibit 1. Jaclyn, I'm having marked VCJ 3 through 5, which is the police report.
   MS. DIAZ: Okay.
   (At which time, DeNeal Deposition Exhibit Number 1 was marked for identification, and the following proceedings were conducted;)
   BY: MR. CONDON
Q. Ms. DeNeal, I'm showing you what we've had marked as DeNeal Exhibit Number 1 which is a police report from the City of Danville Police Department dated July 26 of 2018. And it consists of three pages. If you could go ahead and read what's contained in the report and I'm just going to ask you some questions.
A. On --
Q. No, no. You don't have to read it out loud.
A. Oh.

Page 7

Q. Just to yourself. And then I'll -- you just let me know when you're done and I'll ask you some questions.
A. Okay. Oh, wow.
Q. Okay. Have you had a chance to review Exhibit 1?
A. Yes.
Q. And do you recall this incident that occurred at your residence on July 26 of 2018?
A. Vaguely. But yes.
Q. Okay. And at the time were you living at 1101 1/2 North Franklin?
A. Actually this is my sister's home.
Q. So that address is your sister's address?
A. Uh-huh. And I was visiting at her home at the time.
Q. Okay.
A. And he had called, he had wanted to come over. He was very intoxicated. And --
Q. When you say he, you mean Mr. Roberson?
A. Mr. Roberson was very intoxicated, as

Page 8

usual. And we might have had some words exchanged, he might have had some words exchanged with my sister. Long story short, we did ask him to leave multiple times and he refused. By the time we got down to the stairs then that's when he attacked me and hit me in my right eye and in my stomach.
Q. Okay.
A. Yeah. Caught me off guard.
Q. And after he hit you in your right eye and your stomach, did you or your sister call 9-1-1?
A. I called 9-1-1 to be -- yeah. And he just walked off.
Q. Okay. So after you called 9-1-1 he left your sister's residence?
A. Yes.
Q. Are you aware that he was then picked up by the Danville Police?
A. No, I wasn't.
Q. Okay. Mr. Roberson was charged with domestic battery as a result of this incident. Are you aware of that?
A. Now I am.

**Page 9**

1  Q. Okay. Did you ever appear in court
2  on that charge?
3  A. No.
4  Q. Are you -- do you have any
5  information that Mr. Roberson pled guilty to
6  domestic battery in that case?
7  A. No. I didn't know none of that.
8  Only thing I know is when he called me and told me
9  he got beat up. And that was when he got out.
10  Q. Okay. And what did he tell you about
11  that?
12  A. He said he got punched in the -- he
13  said he got punched in the nose, the officer broke
14  his nose. Just real vaguely. And I just kind of
15  remember that, you know, whatever happened it was
16  basically your fault. If you just would have be
17  quiet, which he doesn't. And I mean, it doesn't
18  give the officer the right to hit him but, you
19  know...
20  Q. And did Mr. Roberson tell you what
21  had occurred just prior to the officer --
22  A. He said he was probably hollering and
23  screaming or he wouldn't sit down, something, I

**Page 10**

1  don't know. It was really vaguely what he was
2  saying and I don't even know if I was listening.
3  Q. Did Mr. Roberson tell you that he
4  grabbed ahold of the officer before the officer hit
5  him?
6  A. No.
7  Q. Okay.
8  A. Ohh wee.
9  Q. And you said that Mr. Roberson, when
10  he showed up at your sister's residence -- well,
11  strike that. About what time was it when he showed
12  up?
13  A. Oh, Lord. To be honest, I really
14  don't know. But I could probably give you around a
15  park figure of probably like 9:30, 10:00.
16  Q. And do you see in the report where it
17  says that Officer Butcher arrived around 2:17 in
18  the morning?
19  A. Oh, no, I didn't see that. Where's
20  that at?
21  Q. In the narrative on the -- right at
22  the beginning.
23  A. Oh, see. Okay. Oh, see. Oh, he

**Page 11**

1  probably arrived there and that's probably when he
2  probably left, around about that time.
3  Q. Well, how long was he at your
4  sister's house before you told him several times to
5  leave?
6  A. To be honest, I don't even know. I
7  can't really say because if he left at 2:00 then I
8  don't even know what time he got there. So it
9  couldn't have been too long before he got there
10  before he was asked to leave, to be honest.
11  Q. All right. And you said that when
12  Mr. Roberson showed up at your sister's residence
13  on July 26 of 2018 that he was very intoxicated?
14  A. Well, he -- yeah. He was -- I know
15  when he's intoxicated. He try to play it off like
16  he ain't. But his demeanor, his speech, all of
17  that displays I'm drunk. So, I mean, I tried to
18  give him the benefit of the doubt, my sister
19  allowed him to come over and hang out for a little
20  bit but he just -- he just does not know how to act
21  in a setting full of grown folks, period.
22  Q. And did Mr. Roberson, did he say
23  anything to you before he punched you in the eye?

**Page 12**

1  A. Ain't no telling. He probably was
2  cussing me out as usual.
3  Q. Okay.
4  A. Being belligerent, you know, just
5  real nasty.
6  Q. And was that Mr. Roberson's
7  personality, was he belligerent and nasty?
8  A. Yeah. That's basically how he is
9  before he drinks and after he drinks.
10  Q. And did Mr. Roberson, during the
11  years that you knew him, did he drink alcohol a
12  lot?
13  A. Uh-huh. Yeah. Alcoholic.
14  Q. He was an alcoholic?
15  A. Uh-huh.
16  Q. Okay.
17  A. Yeah. Real bad.
18  Q. Do you know if Mr. Roberson has
19  sought any treatment --
20  A. No.
21  Q. -- for alcoholism?
22  A. Not at all. I mean, I tried to, you
23  know, help or tried to, you know, resources, stuff